## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

--------------------------------------------------------------X

**ESTATE OF ASKARI JARI ROBERTS**
by **JACKIE ROBERTS** and **DELORIS**
**ROBERTS**, Co-Administrators of the
Estate of Askari Jari Roberts, deceased,
**SUREROME HUNTER**, as Mother and
natural guardian of Ja'Juan Hunter, a minor,
and **SHAUNDRIKA ADAMS**, as mother and
guardian of Amiya Adams, a minor

        v.

**FLOYD COUNTY, GEORGIA**, a political
subdivision of the State of Georgia; SGT.
GREGORY BECK, individually, and in his
capacity as a Sergeant in the Floyd County
Police Department; and SGT. BRANDON
ROBINSON, individually, and in his capacity
as a Sergeant in the Floyd County Police
Department

                            Defendants

**CIVIL ACTION**
**FILE NO.:**
**4:17-CV- 00053 - HLM**

**JURY TRIAL** natural
**DEMANDED**

--------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' RESPONSE
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs support their *Plaintiffs' Response in Opposition to Defendants'*

*Motion to Dismiss (and Plaintiffs' Response in Opposition to Defendants'*

*Statement of Purported Undisputed Material Facts as to Which They Claim There*

*Is No Issue to Be Tried)*, with the within Brief, and respectfully represent to this

Court as follows:

## I.    Statement of Fact

It is not an abuse of discretion to allow a party to incorporate its statement of undisputed material facts in its supporting brief when the district court's local rules require a respondent to file the statement along with its response in opposition to the motion for summary judgment.  Vinnett v. General Electric Co., 271 Fed. Appx. 908, 915 (11th Cir. 2006), as cited in the movants' Brief.  Thus, for the sake of brevity, Plaintiffs herein also incorporate their *Plaintiffs' Response in Opposition to Defendants' Statement of Purported Undisputed Material Facts as to Which They Claim There Is No Issue to Be Tried*, and Exhibits "A" (Jackie Roberts Affidavit) and Exhibits "B" (Ella Roberts Affidavit) attached thereto and made part of that Response, as if the same were set forth here in their entirety verbatim.

However, it is here noted that the instant case is inappropriate for resolution by summary judgment where all the material facts are generated from Affidavits by the only four witnesses to the incident itself and which raise issues of their credibility, the resolution of which lies exclusively within the province of a jury. At this summary judgment stage, this Trial Court "may not weigh conflicting evidence or make credibility determinations of its own. If the record presents disputed issues of fact, the court may not decide them; rather, it must deny the

motion and proceed to trial." FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir.2011).  In the instant case, where the four eyewitnesses present different and conflicting versions of the facts of the decedent's death, the Court must deny the Defendants' motion.  Ibid.

## II.    Arguments and Relevant Law

### A.    Summary Judgment Standard of Review

The grant of summary judgment is subject to de novo review and the circuit court applies the same standard used by the district court. Elan Pharm. Research Corp. v. Employers Ins. of Wausau, 144 F.3d 1372, 1375 (11th Cir.1998); Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir.1999).  The reviewing court reviews the district court's grant of summary judgment de novo, considering all the evidence and factual inferences in the light most favorable to the non-moving party. Wilchombe v. TeeVee Toons, Inc., 555 F.3d 949, 956 (11th Cir.2009).

In Reese v. Herbert, 527 F. 3d 1253 (11th Cir. 2008), the Court said that:

"…..under Rule 56, the moving party:

always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

3

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91
L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)) (emphasis added). The
movant therefore continues to shoulder the initial burden of production in
demonstrating the absence of any genuine issue of material fact, and the
court must satisfy itself that the burden has been satisfactorily discharged.

Reese v. Herbert, 527 F. 3d at 1268 - 1269.

A trial court "may not weigh conflicting evidence or make credibility

determinations of its own. If the record presents disputed issues of fact, the court

may not decide them; rather, it must deny the motion and proceed to trial."

FindWhat Investor Grp. v. FindWhat.com, supra.

At summary judgment, the court cannot simply accept the officer's

subjective version of events, but rather must reconstruct the event in the light most

favorable to the non-moving party and determine whether the officer's use of force

was excessive under those circumstances. Vinyard v. Wilson, 311 F.3d 1340,

1347-48 (11th Cir.2002).

**B.      Officers Beck and Robinson Are Not Entitled to Qualified
         Immunity**

    **1.      Qualified Immunity In the 11th Circuit.**

Qualified immunity protects government officials sued in their individual

capacities if "their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." Harlow v.

Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).   The

Supreme Court has adopted a two-part test for evaluating a claim of qualified

immunity. The plaintiff must show that (1) there was a Constitutional violation,

and (2) that the illegality of the defendant's actions was clearly established at the

time of the incident. Hoyt v. Cooks, 672 F.3d 972, 977 (11th Cir. 2012). The Court

need not decide whether there was a constitutional violation if illegality of the

conduct was not clearly established at the time. Id.  When a court concludes the

defendant was engaged in a discretionary function, "the burden shifts to the

plaintiff to show that the defendant is not entitled to qualified immunity."

Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir.2004).

In Oliver v. Fiorino, 586 F.3d 898 (2009), the 11th Circuit considered an

appeal from the district court's denial of a motion for summary judgment on the

basis of qualified immunity.  The officer in Oliver deployed a Taser multiple

times, even after the individual was "immobilized," "limp," and "writhing in pain."

Under those circumstances, the court held that the officer was not entitled to

qualified immunity because the force used was "so plainly unnecessary and

disproportionate that no reasonable officer could have thought that this amount of

force was legal under the circumstances." Id.  While the initial Taser shock may

have been justified, the repeated tasering of Oliver into and beyond his complete

5

physical capitulation was grossly disproportionate to any threat posed and unreasonable under the circumstances, thereby establishing a Fourth Amendment Violation.  Oliver v. Fiorino, 586 F.3d at 907.

Two years later, the Court considered the appeal of Fils v. City of Aventura, 647 F.3d 1272 (2011), which also involved claims of excessive force against local police officers under 42 U.S.C. §1983.  Here, the Eleventh Circuit examined other excessive force cases from the circuit and held, in line with those cases, that unprovoked force against a non-hostile and non-violent suspect, who had not disobeyed instructions violated his rights under the Fourth Amendment.

With respect to Plaintiff Maurice, the Court accepted his facts asserting that he and a female friend, Cindy Fils, attended a party together at a club in Aventura, Florida.  The party was peaceful until a commotion started which spilled outside. While watching officers make arrests, the Plaintiff and commented that "they're overreacting, these motherfuckers are overreacting." A police officer heard what he said and wound up tasing the Plaintiff; when he did not fall down, he was tased again, after which he fell to the ground.  An Officer put his knees on the Plaintiff's back and applied a contact tase to the back of his neck, "grinding" the taser.

The Court reiterated the two-part framework of first determining whether the Plaintiffs' allegations, and the evidence viewed in their favor, establish a

6

constitutional violation, and then determining whether the right was "clearly

established," such that a reasonable officer should have known that his conduct

violated the plaintiff's constitutional rights. The Court noted that the two steps do

not have to be analyzed sequentially; if the law was not clearly established, we

need not decide if the Defendants actually violated the Plaintiffs' rights, although

we are permitted to do so. Oliver v. Fiorino, supra.

Here, the Court had similar 11th Circuit cases to consider, unlike the Court

in Oliver, supra.  Before concluding that the officers' use of force was excessive,

the Court reflected that: 1)  the crime for which the Plaintiff was arrested was not

serious; 2) the Plaintiff clearly did not present a threat to the officers' safety; and

3) the Plaintiff was not resisting arrest or attempting to escape. Fils, et al v. City of

Aventura, et al., 647 F.3d at 1288 - 1289.  The Fils court opined that:

> Our conclusion is in line with other excessive force cases from this court.
> Put together, these cases establish that unprovoked force against a
> non-hostile and non-violent suspect who has not disobeyed instructions
> violates that suspect's rights under the Fourth Amendment.

Fils, et al v. City of Aventura, et al., 647 F.3d at 1289.

Recently, the 11th Circuit confirmed the Oliver and Fils principles when it

considered the excessive force case of Wate v. Kubler, 839 F.3d 1012 (11th Cir.,

2016).  This case involved a decedent who was tased five times, with two tasings

7

coming after he had stopped resisting.  Eventually, he died.

Considering first whether the Defendant had violated the decedent's

constitutional, the Court noted that:

> We are charged with examining "the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balanc[ing] the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." McCullough v. Antolini, 559 F.3d 1201, 1206 (11th Cir. 2009) (citing Scott v. Harris, 550 U.S. 372, 383, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)). "Although some amount of force is generally needed to subdue a suspect, the amount used must be reasonably proportionate to the need for force." Smith v. LePage, 834 F.3d 1285, 1294, 2016 WL 4473223, at *5 (11th Cir. August 25, 2016) (citing Lee, 284 F.3d at 1197-98); see also Scott, 550 U.S. at 383, 127 S.Ct. 1769 (observing that in determining whether the Fourth Amendment was violated, "we must still slosh our way through the fact-bound morass of `reasonableness.'"). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97, 109 S.Ct. 1865. We make this inquiry without regard to the officer's underlying intent or motivation. Id. at 397, 109 S.Ct. 1865. "Officers may use force that is `necessary in the situation at hand.'" Fils, 647 F.3d at 1288....At summary judgment, we cannot simply accept the officers' subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances." Id. (citing Vinyard v. Wilson, 311 F.3d 1340, 1347-48 (11th Cir. 2002)).

Wate v. Kubler, 839 F.3d at 1019- 1020.  In Wate, the Court reasoned that the

decedent was no longer resisting, at least after the first two tasings, and that

Kubler's further use of the Taser was wholly unnecessary, and grossly

disproportionate to the circumstances.  There were two officers on scene, and they immobilized the decedent face down in the sand.  The decedent had no weapon and was awkwardly handcuffed.  They opined that, while the first or maybe even the second tasing may have been warranted since the decedent had been resisting, by the third tasing, the decedent was handcuffed, immobile and still, such that a reasonable officer in Defendant Kubler's position would conclude that the decedent did not present a risk of flight, or a threat of danger to the officers or to the public. Further shocks were unnecessary and grossly disproportionate, and a jury could find that Defendant Kubler's five tasings of the decedent constituted unreasonable force violative of he Fourth Amendment.  Id. at 1021.

Finally, the Court concluded that, based on <u>Oliver v. Fiorino</u>, supra, a reasonable officer in Kubler's position would have had fair warning that repeatedly tasing a person after he was handcuffed and had ceased struggling and resisting was unreasonable under the Fourth Amendment.  Thus, no qualified immunity.  Id.

      **2.      The Defendants' Conduct Violated the Decedent's Fourth Amendment Rights to be Free From Unreasonable Searches and Seizures Where Their Conduct Was Objectively Unreasonable.**

The Plaintiffs here concede that, at the time of the complained-of events, Defendants Beck and Robinson were performing discretionary functions. <u>Holloman ex rel. Holloman v. Harland</u>, supra.

9

In order to determine whether the use of force is "objectively reasonable," we carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against "the countervailing governmental interests at stake" under the facts of the particular case. Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). We measure the quantum of force employed against these factors — a) the severity of the crime at issue; b) whether the suspect poses an immediate threat to the safety of the officers or others; and c) whether the suspect actively resisted arrest or attempted to evade arrest by flight. Lee v. Ferraro, 284 F.3d 1188, 1197 - 98 (11th Cir.2002).

In the instant case, the Defendants' conduct toward decedent Askari Roberts was objectively unreasonable. Before considering the three factors outlined above, however, the Court should understand that the central actor in this excessive force scenario was the decedent, Askari Roberts, who stood 5'2" tall and weighed 151 pounds. (Defendant's Exhibit "F", P. 4). He was short of stature and smaller than his teenaged son. (Plaintiffs' Exhibit "A", Jackie Roberts Affidavit, Para. 3). The decedent was unarmed.

At summary judgment, the Court cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force

was excessive under those circumstances. <u>Fils v. City of Aventura</u>, supra at 1288;

<u>Wilchombe v. TeeVee Toons, Inc.</u>, supra.

### a)    The severity of the "Crime" at issue.

The initial facts giving rise to this case are not in material dispute.  On

March 17, 2015, Plaintiff Deloris "Ella" Roberts telephoned the Fulton County

Sheriff and reported that decedent Askari Roberts was "acting a fool" and had

tried to choke her.  (Defendants SUF, Paras. 3, 4).  The decedent had begun to talk

and act crazy.  (Plaintiffs Exhibit "A", Jackie Roberts Affidavit, Para 3).

When Defendant Robinson arrived, there was no evidence of any crime

being committed.  The decedent was not armed.  The decedent had been subdued

by his father for some 20 minutes and was still subdued when Officer Robinson

arrived.  There was no yelling or other physical violence being shown.  (Plaintiff's

Exhibit "A", Jackie Roberts' Affidavit, Paras. 3, 4; Plaintiff's Exhibit "B", Ella

Roberts Affidavit, Paras. 2, 3).

If any crime was at issue, it could not have risen above a domestic relations

crime,....at worst, simple assault, based solely on Ella Roberts telephonic claim

that the decedent had tried to choke her .  However, where there was no other

evidence of any harm to her, no evidence of choking, there was actually no crime

involved; it was a simple domestic relations matter.

11

**b)**   **Whether the suspect poses an immediate threat to the safety of the officers or others.**

As noted above, the decedent only weighed 151 pounds and stood slightly over 5'. He was unarmed. When Officer Robinson arrived, the decedent was completely subdued by Plaintiff Jackie Roberts, the decedent's father, who had held the decedent immobile and subdued for some 20 minutes simply by standing in front of him, leaning on him and holding his wrists. The decedent was not screaming and yelling; he was not offering ay resistance. (Exhibit "A", Jackie Roberts' Affidavit, Paras. 3, 4; Exhibit "A", Ella Roberts' Affidavit, Paras. 2). He was not posing an immediate threat to anyone when Officer Robinson arrived.

If Officer Robinson had not tried to handcuff the decedent, bear-hugged him and slung him around, the decedent would not have begun to struggle. However, even assuming that the decedent had begun to struggle and avoid efforts to handcuff him, Officer Robinson was able to subdue the decedent all by himself even before Officer Beck arrived. When Defendant Beck arrived, then, there was no real reason to tase the decedent, but Defendant Robinson told Defendant Beck that he was going to have to tase the decedent. (Plaintiff's Exhibit "A", Jackie Roberts Affidavit, Para 5; Plaintiffs' Exhibit "B", Ella Roberts Affidavit, Para. 4). That's when the tasing began.

12

Officer Robinson did not have a taser.  Just as the decedent's father had been able to physically subdue the decedent, so too had Officer Robinson been able to subdue the decedent by simple brute strength without the aid of a taser. Plaintiff Ella Roberts disclosed that, by the time Officer Beck arrived, Officer Robinson had his knee in the decedent's back and was holding him down. (Exhibit "B", Ella Roberts Affidavit, Paras. 3, 4, Exhibit "A", Jackie Roberts Affidavit, Paras 3, 4).  By that time, the decedent did not pose a serious threat to Officer Robinson or anyone else.

### c)    Whether the suspect actively resisted arrest or attempted to evade arrest by flight.

It was only after Officer Robinson arrived that problems arose.  When Officer Robinson arrived, and even though the decedent was already subdued by his father, Officer Robinson immediately tried to handcuff the decedent.  It was only then that the decedent began squirming and resisting efforts to handcuff him. (Plaintiff's Exhibit "A", Jackie Roberts Affidavit, Para. 4; Plaintiffs Exhibit "B", Ella Roberts Affidavit, Paras. 3, 4).

When the decedent did not obey Officer Robinson's direction to stand up, Officer Robinson then physically snatched the decedent up, bear-hugged him, and began to sling him around violently.  (Plaintiff's Exhibit "B", Jackie Roberts

Affidavit, Para 3; Plaintiffs' Exhibit "B", Ella Roberts Affidavit, Para. 3).  He "man-handled" the decedent.  "No "soft hand" techniques were employed; no effort to talk with the decedent was made.  The decedent and Officer Robinson then fell to the floor where Defendant Robinson maneuvered the decedent onto his stomach and placed his knee in the decedent's back.  (Plaintiff's Exhibit "A", Jackie Roberts Affidavit, Para 4; Plaintiffs' Exhibit "B", Ella Roberts Affidavit, Para. 3).  Thus, with the decedent on his stomach and a knee in his back, the 150 pound decedent was subdued by Officer Robinson before Officer Beck arrived.

Even when Officer Robinson man-handled the decedent, the decedent did not kick, scream or make any effort to escape or run away; rather, he squirmed, twisted and turned to avoid being handcuffed.  (Plaintiffs' Exhibit "B", Ella Roberts Affidavit, Para. 3).  During the entire ordeal, decedent never tried to grab Officer Beck's taser, never fought with the officers, never tried to bite the officers or escape to the door.  (Plaintiffs' Exhibit "A", Jackie Roberts Affidavit, Para. 5).  Even though Officer Beck was not threatened by the physically subdued, 150 pound decedent, Officer Beck began tasing the decedent until he lost consciousness.  (Plaintiffs' Exhibit "A", Jackie Roberts Affidavit, Paras. 3 - 5).  There had been no need whatsoever for Officer Beck to tase the decedent.

Under these circumstances, where there was no serious crime involved,

14

where the 150 pound decedent did not pose an immediate threat to either

Defendant, and where the decedent had only responded to Officer Robinson's

heavy handed techniques and had not made any effort to flee or escape, tasering

the 150 pound, already subdued decedent multiple times was objectively

unreasonable.  Oliver v. Fiorino, supra, Fils, et al, v. City of Aventura, et al, supra;

Wate v. Kubler, supra.

> 3. **The Right That Defendants Beck and Robinson Violated
> Were Clearly Established under Oliveri v. Fiorino, supra,
> and Fils v. City of Aventura, supra.**

The second step in determining whether an officer is entitled to qualified

immunity is to determine whether the right violated by the time the Defendant

officers acted had been clearly established, whether a reasonable officer should

have known that his conduct violated the plaintiff's constitutional rights.  Fils v.

City of Aventura, supra.  In Fils, the 11th Circuit disclosed that:

> "Our circuit uses two methods to determine whether a reasonable officer
> would know that his conduct is unconstitutional. The first method looks at
> the relevant case law at the time of the violation; the right is clearly
> established if "a concrete factual context [exists] so as to make it obvious to
> a reasonable government actor that his actions violate federal law." Hadley,
> 526 F.3d at 1333 (citation and internal quotations omitted). .... The second
> method looks not at case law, but at the officer's conduct, and inquires
> whether that conduct "lies so obviously at the very core of what the Fourth
> Amendment prohibits that the unlawfulness of the conduct was readily
> apparent to [the officer], notwithstanding the lack of fact-specific case law."
> Vinyard, 311 F.3d at 1355 (citations and internal quotations omitted).

Fils v. City of Aventura, 647 F.3d at 1291.

Looking first to the case law, as the 11th Circuit disclosed in 2009 in Oliver v. Fiorino, supra, a reasonable officer should know that repeatedly tasing a person after he was handcuffed and had ceased struggling and resisting was unreasonable under the Fourth Amendment.  In accord, Wate v. Kubler, supra  (Based upon the 11th Circuit's holding in Oliver v. Fiorino, supra, a reasonable officer should know that repeatedly tasing a person after he was handcuffed and had ceased struggling and resisting was unreasonable under the Fourth Amendment.)

Thus, in 2015, when Defendant Beck subjected decedent Akari Roberts to repeated taserings, it was clearly established under 11th Circuit law that subjecting a person who was involved in what, at best, was a minor crime, was slight of build, unarmed and not posing a physical threat to him or anyone else, and was not trying to flee or escape was unreasonable under the Fourth Amendment.  Oliveri v. Fiori, supra, Fils v. City of Aventura, supra, Wate v. Kubler, supra.

Looking simply at the facts of the case warrants the same conclusion.  As pointed out above, Officer Robinson did not have a taser when he arrived at the Plaintiffs' home.  Just as the decedent's father had been able to physically subdue the decedent, so too had Officer Robinson been able to subdue the decedent by simple brute strength and without the aid of a taser.  By Officer Beck's arrival

16

with the taser, Officer Robinson had his knee in the decedent's back and was

holding him down.  (Exhibit "B", Ella Roberts Affidavit, Paras. 3, 4, Exhibit "A",

Jackie Roberts Affidavit, Paras 3, 4).  By that time, the decedent did not pose a

serious threat to anyone. Pinned down on his stomach by just one man, there was

no reason to tase the decedent where, if additional force was required, he could

have augmented Officer Robinson's strength with his own brute strength to

subdue the decedent.  Tasering a subdued man who is not posing a serious threat

of physical harm to the police or anyone else lies so obviously at the very core of

what the Fourth Amendment prohibits that the unlawfulness of Officer Beck's

conduct was readily apparent to him and was objectively unreasonable under the

Fourth Amendment.  Fils v. City of Aventura, supra.

Thus, whether looking at the case law or the specific facts themselves, that

tasering an unarmed, subdued and non-threatening decedent multiple times was

unreasonable under the Fourth Amendment was clearly established law.

In conclusion, Defendants Robinson and Beck are not entitled to qualified

immunity from prosecution for violation of 42 U. S. C. §1983 and the Fourth

Amendment.

**C.    Officers Beck and Robinson Are Not Entitled to Summary
Judgment on the Plaintiff's State Law Claims.**

17

### 1.    Defendants Are Not Entitled to Official Immunity

In <u>McDowell v. Smith</u>, 285 Ga. 592, 678 SE 2d 922 (Ga. Supreme Court

2009), the Georgia Supreme Court disclosed that:

> The doctrine of official immunity, also known as qualified immunity, ...
> "protects individual public agents from personal liability for discretionary
> actions taken within the scope of their official authority, and done without
> wilfulness, malice, or corruption." [Cit.] Under Georgia law, a public officer
> or employee may be personally liable only for ministerial acts negligently
> performed or acts performed with malice or an intent to injure. [Cit.] The
> rationale for this immunity is to preserve the public employee's
> independence of action without fear of lawsuits and to prevent a review of
> his or her judgment in hindsight. [Cits.]

<u>McDowell v. Smith</u>, 678 SE 2d at 924.  In accord, <u>Grammens v. Dollar</u>, 697 SE 2d

775, 287 Ga. 618 (Ga. Supreme Ct. 2010); <u>Austin v. Clark</u>, 755 SE 2d 796, 294

Ga. 773 (Ga. Supreme Ct. 2014).  With respect to the question of whether an

official is performing a discretionary function, the <u>McDowell</u> Court disclosed that:

> "....the determination of whether (an official) is entitled to official immunity
> turns on the issue of whether her actions were discretionary or ministerial.
>
> A ministerial act is commonly one that is simple, absolute, and definite,
> arising under conditions admitted or proved to exist, and requiring merely
> the execution of a specific duty. A discretionary act, however, calls for the
> exercise of personal deliberation and judgment, which in turn entails
> examining the facts, reaching reasoned conclusions, and acting on them in a
> way not specifically directed.

<u>McDowell v. Smith</u>, supra.

In the instant case, the Plaintiff concedes that the acts and failures to act of

18

the two defendants, Beck and Robinson, were discretionary acts calling for the exercise of personal deliberation and judgment, examining the facts and making judgments. McDowell v. Smith, supra. However, the Defendants are not entitled to official immunity where, as indicated above, their discretionary acts were exercised maliciously or wilfully.

As noted, the unarmed decedent only weighed 151 pounds and stood slightly over 5'. When Officer Robinson arrived at the Plaintiffs' home, the decedent was completely subdued by his father, who had held the decedent immobile and subdued for some 20 minutes before Officer Robinson even arrived. Plaintiff Jackie Roberts had been able to subdue his son simply by standing in front of him, leaning on him and holding his wrists. The decedent was not screaming and yelling; he was not offering ay resistance. (Exhibit "A", Jackie Roberts' Affidavit, Paras. 3, 4; Exhibit "A", Ella Roberts' Affidavit, Paras. 2). Officer Robinson began trying to handcuff the decedent, but the decedent did not want to be handcuffed. He squirmed, twisted and wiggled to keep from being handcuffed, but he did not kick, bite or hit the officer. Just the same, Officer Robinson manhandled the decedent and finally subdued him by wrestling him to the ground, and putting his knee in the decedent's back. (Plaintiffs' Exhibit "A", Jackie Roberts Affidavit, Paras. 3 - 5; Plaintiffs' Exhibit, Ella Roberts' Affidavit,

19

Paras. 2 - 3).  On the floor with a knee in his back, the decedent did not pose an immediate threat to anyone.  As soon as Officer Beck arrived, Officer Robinson told Officer Beck that the decedent would have to be tased.  (Plaintiffs' Exhibit "A", Jackie Roberts Affidavit, Paras. 3 - 5; Plaintiffs' Exhibit "B", Ella Roberts' Affidavit, Paras. 4 - 5).

In <u>Murphy v. Bajjani</u>, 647 SE 2d 54, 282 Ga. 197 (Ga. Supreme Court 2007), the Georgia Supreme Court disclosed that

> "A public agent's acts do not have official immunity if they are discretionary acts committed "with actual malice or with intent to cause injury." 1983 Ga. Const., Art. I, Sec. II, Para. IX(d). "Actual malice," as that term is used in the constitutional provision, denotes "express malice," i.e., "a deliberate intention to do wrong," and does not include "implied malice," i.e., the reckless disregard for the rights or safety of others. <u>Merrow v. Hawkins</u>, 266 Ga. 390, 391-392, 467 S.E.2d 336 (1996).  A "deliberate intention to do wrong" such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiffs."

<u>Murphy v. Bajjani</u>, 647 SE2d at 60.

A jury could determine that Officer Robinson, who had already subdued the decedent and knew that there was no reason to tase him, wanted the decedent tased for no other reason than to do wrong and cause him harm, to use the taser to hurt him.  Thus, a jury could find that this decision was malicious. <u>Murphy v. Bajjani</u>, supra.

20

When Defendant Beck arrived, then, there was no reason to tase the decedent except to hurt him.  Just the same, Defendant Beck thereupon tased the decedent multiple times and until the decedent lost consciousness. Where there had been no reason to tase a man who was already subdued and whom he could have further subdued or restrain by adding his physical strength to Officer Robinson's, Officer Beck's tasing the decedent multiple times was done for no other reason than to do wrong and cause the decedent harm.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56(c). To prevail on a motion for summary judgment, "'the moving party must demonstrate that there is no genuine issue of material fact,'" Montgomery v. Barrow, 286 Ga. 896, 898, 692 S.E.2d 351 (2010) (citation omitted), so that the party "is entitled to judgment as a matter of law," Kaplan v. City of Sandy Springs, 286 Ga. 559, 560, 690 S.E.2d 395 (2010).

In the instant case, a trier of fact could conclude that the Defendants' tasing of a decedent who was already subdued and who did not pose a threat to anyone was done maliciously and for the deliberate purpose of hurting the decedent and

subjecting him to pain.  Where the issue is not clear and free from doubt, the

Defendants are not entitled to a grant of summary judgment in their favor on the

issue of official immunity.  Montgomery v. Barrow, supra; Kaplan v. City of

Sandy Springs, supra.

Thus, the Defendants Beck and Robinson are not entitled to a grant of

official immunity in the instant case where their acts were malicious.  McDowell

v. Smith, supra; Murphy v. Bajjani, supra;  Montgomery v. Barrow, supra; Kaplan

v. City of Sandy Springs, supra.

### 2.    Plaintiffs' Wrongful Death Claim Is Viable.

Under Georgia law, a police officer may be personally liable only for

discretionary acts performed with malice or an intent to injure.  McDowell v.

Smith, supra; Murphy v. Bajjani, supra.

The case cited by the Defendants, Campbell v. Goode, 304 Ga.App. 47, 695

S.E.2d 44, 45 (2010), stands for the proposition that the defendants cannot be held

liable under Georgia law for any negligence-based claim resulting from the

performance of discretionary acts.  Hoyt v. Cooks, 672 F. 3d 972 (11thCir. 2012).

The Defendants contend that wrongful death claims are premised only on

negligence, but such is not the case.

The Decedent's death certificate at Box 37 indicates that decedent Askari

22

Case 4:17-cv-00053-HLM   Document 26-1   Filed 11/19/17   Page 23 of 35

Robert's death was a "Homicide" (Defendant's Exhibit "G").

Under O.C.G.A. § 51-4-1 of the Georgia Code, "Homicide" includes all cases in which the death of a human being results from a crime, from criminal or other negligence, or from property which has been defectively manufactured, whether or not as the result of negligence. Under O.C.G.A. § 51-4-2(a), the child or children, either minor or *sui juris*, may recover for the homicide of the parent for the full value of the life of the decedent, as shown by the evidence. Thus, wrongful death includes death by both negligent and intentional conduct.

In the instant case, however, the Plaintiffs' claims are not negligence-based, but advance the claim that the Defendants acted with malice and intended to cause harm. Thus, the issue of whether or not the Defendants can be held liable for the death of Askari Roberts where they performed their discretionary duties maliciously and intended to cause harm is not so clear and free from doubt at this stage to warrant the grant of summary judgment in the Defendants' favor. Montgomery v. Barrow, supra; Kaplan v. City of Sandy Springs, supra.

## III.   Conclusion

For the reasons outlined above, the Plaintiffs respectfully request that the Defendants' Motion for Summary Judgment be DENIED in its entirety and the matter allowed to proceed to trial.

Respectfully submitted:

Date: November 19, 2017

//s// Michael E. Davis          .
Michael E.  Davis, Esquire
Attorney for Plaintiffs
8 No. Preston Street
Philadelphia, PA 19104

## CERTIFICATION OF COUNSEL

The undersigned Counsel for Plaintiffs here certifies that, pursuant to the

Court's Local Rules, this document has been prepared with New Times Roman 14

point font.

By:

Date: November 19, 2017

//s// Michael E. Davis          .
Michael E.  Davis, Esquire
Attorney for Plaintiffs
8 No. Preston Street
Philadelphia, PA 19104

24

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

JACKIE ROBERTS and DELORIS ROBERTS)
as Co-Administrators of the Estate of )
Askari Jari Roberts; SUREROME HUNTER, )
as mother and natural guardian of )
Ja'Juan Hunter, a minor; and SHAUNDRIKA )
ADAMS, as mother and natural guardian of )
AMIYA ADAMS, a minor, )
                                      )      **CIVIL ACTION FILE**

            Plaintiffs, )
                                        )
v.                                       )      **NO. 4:17-CV-53-HLM**
                                        )
                                        )
FLOYD COUNTY, GEORGIA, a political )
subdivision of the State of Georgia; )      **JURY TRIAL**
SGT. GREGORY BECK, individually, and in )      **DEMANDED**
his capacity as a Sergeant in the Floyd County )
Police Department; and SGT. BRANDON )
ROBINSON, individually, and in his capacity )
as a Sergeant in the Floyd County Police )
Department, )
                                        )
           Defendants. )

## AFFIDAVIT OF JACKIE ROBERTS

1. I, Jackie Roberts am sixty-seven (67) years of age, suffer from no legal

    disabilities and am otherwise competent to make this affidavit. I make

    this affidavit from my own personal knowledge and for use in behalf of

Plaintiffs opposition to defendant's motion for summary judgment, and for all other legal purposes.

2.  On March 17, 2015 around 9:30pm, I began to hold my son Askari down because he began to talk and act crazy. At no time did he have a weapon. I held him down by standing in front of him, holding his wrists and leaning on him for about 20 minutes until the first police officer, officer Robinson arrived. Askari weighs about 150 pounds and is smaller than his fourteen (14) year old son. (Photo attached) He did not attempt to get away as I held him. He was sitting at the left end of the love seat and I was standing in front of him holding his wrists.

3.  When officer Robinson arrived at my house no one was yelling. I was holding Askari down and he was not trying to get away. Officer Robinson came in, walked over to the chair where I was standing and put a handcuff on Askari's left wrist. I then released Askari. The officer asked Askari to stand up so he could put the hand cuff on his right hand but Askari did not get up. Officer Robinson then snacthed Askari up and grabbed him in a bear hug around his entire body and slung Askari around to the right. Askari's foot hit the TV screen and knocked it out. Askari and the officer fell to the floor. I went over to Askari and the

officer to talk to Askari so the officer would not hurt him. I kneeled down by Askari and the officer with one hand on Askari's leg and was telling him to stop resisting so he would not be hurt.

4. When the second officer arrived, officer Beck, he came in the side door, walked over and stood at Askari's feet. Officer Robinson was holding Askari down with his knee in his back and I was still talking to Askari. Officer Beck did not try to assist in putting the second hand cuff on. Askari had his left arm and the handcuff under his stomach and was still struggling trying to get up. Officer Roberson told officer Beck " you are gonna have to tase him". I got up and that's when officer Beck began to stun gun Askari. He stun gunned Askari several times under his left armpit near his chest in an attempt to get to the handcuff. He also stun gunned him on his right side. Officer Robinson held Askari down with his knee in Askari's back as Askari laid on his stomach with his left arm and the handcuffs underneath him.  Askari never got up to try to grab the taser, never fought the officers, never tried to bite the officers and never tried to escape to the door. He did struggle to try to get up but officer Robinson had his knee in his back. Askari stopped moving and breathing after the third or fourth stun. The police officer

tased him until he lost consciousness. When Askari lost consciousness, my wife asked officer Robinson if Askari was still breathing. Officer Robinson said no. Officer Robinson rolled Askari over and put the second handcuff on his right wrist. They tried to do CPR but could not revive him.

5.   Statements 41-46 of the defendants' statement of material facts are also false. Askari never regained consciousness after he passed out and was never near the front. The video the officers provided show that he was never near the front door.

6.   After they could not revive him, the paramedics took him out and worked on him for a while and then took him to the hospital. One of the police officer told us that they would stay at the house so  we could go up to the hospital. *Jackie Roberts*

**SWORN TO AND SUBSCRIBED BEFORE ME THIS __17th__ DAY OF NOVEMBER, 2017.**

*Lucette J. Smith*

**MY COMMISSION EXPIRES:** _12-25-18_

← JackieRobertsAffidavit



 Gmail

Michael Davis <michael.earl.davis@gmail.com>

## (no subject)

Michael Davis <michael.earl.davis@gmail.com>                    Sun, Nov 19, 2017 at 8:47 AM
Draft



--
Michael Earl Davis, Esquire
U.S. Army JAG (Ret)
8 North Preston Street
Philadelphia, PA 19104
571-340-8243

# EXHIBIT  B

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | | |
|---|---|---|
| **JACKIE ROBERTS and DELORIS ROBERTS)**<br>**as Co-Administrators of the Estate of** )<br>**Askari Jari Roberts; SUREROME HUNTER,** )<br>**as mother and natural guardian of** )<br>**Ja'Juan Hunter, a minor; and SHAUNDRIKA** )<br>**ADAMS, as mother and natural guardian of** )<br>**AMIYA ADAMS, a minor,** )<br> )<br>     **Plaintiffs,** )<br> )<br>**v.** )<br> )<br> )<br>**FLOYD COUNTY, GEORGIA, a political** )<br>**subdivision of the State of Georgia;** )<br>**SGT. GREGORY BECK, individually, and in** )<br>**his capacity as a Sergeant in the Floyd County** )<br>**Police Department; and SGT. BRANDON** )<br>**ROBINSON, individually, and in his capacity** )<br>**as a Sergeant in the Floyd County Police** )<br>**Department,** )<br> )<br>     **Defendants.** ) | | **CIVIL ACTION FILE**<br><br>**NO. 4:17-CV-53-HLM**<br><br><br>**JURY TRIAL**<br>**DEMANDED** |

## AFFIDAVIT OF ELLA ROBERTS

1. I, Ella Roberts, am seventy (70) years old, suffer from no legal

   disabilities and am otherwise competent to make this affidavit. I make

   this affidavit from my own personal knowledge and for use in behalf of

Plaintiffs opposition to defendant's motion for summary judgment, and for all other legal purposes.

2. On March 17, 2015 around 9:30pm, I observed my husband Jackie Roberts hold my stepson Askari Roberts in a love seat by holding his wrists for about 20 minutes until a police officer arrived. Askari was not yelling and had not tried to get away from my husband. Askari never had a weapon of any kind.

3. When the first police officer arrived my husband was still holding Askari down by holding his wrists and he was leaning on Askari. The police officer came in, put a hand cuff on Askari and took over from my husband by bear-hugging Askari. He slung Askari around and Askari's foot hit the TV knocking the screen out. The officer and Askari both hit the floor. Askari as not kicking anyone. He was twisting and turning trying to break free but he couldn't because the officer put Askari on his stomach and had his knee in Askari's back. Askari put his left hand with the cuff on it under his stomach to prevent the officer from getting to it. Askari was never able to break free and ran. Askari never fought the officer and never tried to grab the taser. The officer had his knee in Askari's back and Askari was twisting and turning trying to break free.

4. When the second police officer came. Askari was being held down by the first police officer who had his knee in Askari's back and my husband was still trying to talk to Askari. The first police officer told the second one " you are gonna have to tase him" .

5. The second police officer immediately began to tase him. He tased him several times in an attempt to get Askari's left arm from underneath his stomach. He also tased him on his right side. Askari would not remove his left arm from underneath his stomach.

6. The police officer tased him until he lost consciousness. I could see that Askari was not breathing and asked the officers if he was still breathing. Officer Robinson said he was not breathing. Officer Robinson then rolled Askari over and put the second handcuff on him.

7. Statements 15 of the statement of material facts is false. Askari never fought with the officer.

8. Statement 20 of the statement of material facts is false and the video proves it. Askari was never able to get up because officer Robinson had his knee in Askari's back. The video shows the door during the entire incident.

9. Statement 22 is false. My husband did not try to help officer Robinson by holding Askari down. My husband was trying to talk to Askari to keep him from twisting and turning.

10. Statement 30 is false because Askari never tried to grab the taser. Askari was trying to prevent the officer from grabbing his left arm and was squirming trying to break free but he could not break free.

11. At no time did Askari "fight" the officers. Askari was twisting and squirming trying to prevent the officer from getting his left arm. He could not get away because officer Robinson had his knee in his back.

12. Officer Beck tased Askari until he lost consciousness. Officer Robinson then rolled Askari over and put the second cuff on his right hand.

13. After he lost consciousness he never regained consciousness but he did start to breathe a little.

14. Statements 41-46 are false. After Askari lost consciousness and Officer Robinson put the second handcuff on his right wrist, Askari never regained consciousness. *Ella Roberts*

SWORN TO AND SUBSCRIBED BEFORE ME THIS 17th DAY OF NOVEMBER, 2017.

*Lucette J. Smith*

MY COMMISSION EXPIRES: 12-25-18