# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

| | |
|---|---|
| JACKIE ROBERTS, as co-Administrator of the Estate of Askari Jari Roberts, DELORIS ROBERTS, as Co-Administrator of the Estate of Askari Jari Roberts, SUREROME HUNTER, as mother and natural guardian of Ja'Juan Hunter, a minor, and SHAUNDRIKA ADAMS, as mother and natural guardian of Amiya Adams, a minor,<br><br>Plaintiffs,<br><br>v.<br><br>SGT. GREGORY BECK and SGT. BRANDON ROBINSON,<br><br>Defendants. | CIVIL ACTION FILE NO. 4:17-CV-0053-HLM |

## ORDER

This case is before the Court on Defendants' Motion for Summary Judgment [23].

## I.   Background

### A.   Factual Background

Keeping in mind that, when deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts. Strickland v. Norfolk S. Ry. Co., 692 F.3d 1151, 1154 (11th Cir. 2012). This statement does not represent actual findings of fact. Rich v. Sec'y, Fla. Dep't of Corr., 716 F.3d 525, 530 (11th Cir. 2013). Instead, the Court has provided the statement simply to place the Court's legal analysis in the context of this particular case or controversy.

As required by the Local Rules, Defendants, as movants, filed a Statement of Material Facts ("DSMF") in

2

support of their Motion for Summary Judgment. (DSMF (Docket Entry No. 23-1).) As also required by the Local Rules, Plaintiffs filed a response to DSMF ("PRDSMF"). (PRDSMF (Docket Entry No. 26).) The Court evaluates DSMF and PRDSMF infra.

### 1.   The Parties

Plaintiffs Jackie Roberts and Deloris Roberts are the Co-Administrators of the Estate of Askari Jari Roberts (the "Decedent"), and they reside in Rome, Georgia. (Compl. (Docket Entry No. 1) ¶¶ 3-5.) Plaintiff Jackie Roberts is the Decedent's father, while Plaintiff Deloris Roberts is his mother. (Id. ¶ 6.) Plaintiff Ja'Juan Hunter is the Decedent's minor son, and brings this action by and through his mother and natural guardian, Plaintiff Surerome Hunter. (Id. ¶¶ 6-7.) Plaintiff Amiya Adams is the Decedent's minor daughter, and

brings this action by and through her mother and natural guardian, Plaintiff Shaundrika Adams.  (Id. ¶¶ 6, 8.)

At all material times, Defendant Robinson was an officer with the Floyd County Police Department (the "FCPD"). (DSMF ¶ 1; PRDSMF ¶ 1.)  Similarly, at all material times, Defendant Beck was an officer with the FCPD.  (DSMF ¶ 2; PRDSMF ¶ 2.)

### 2.  911 Call

At 21:30:45 hours on March 17, 2015, Floyd County 911 received a telephone call from Ella Roberts stating that the Decedent attempted to choke her, had attempted to hurt Plaintiff Jackie Roberts, and was "acting a fool."  (DSMF ¶ 3; PRDSMF ¶ 3.)  Ella Roberts further stated that the Decedent, who she believed was "on some drugs," had to be held down by Plaintiff Jackie Roberts to keep him from hurting others. (DSMF ¶ 4; PRDSMF ¶ 4.)  Ella Roberts did not specify

4

which drug she believed the Decedent had taken during her conversation with Floyd County 911.  (DSMF ¶ 5; PRDSMF ¶ 5.)  Floyd County 911 dispatched Defendants to the incident location and provided Defendants with the information received from Ella Roberts.  (DSMF ¶ 6; PRDSMF ¶ 6.)

### 3.   Defendant Robinson Arrives

At 21:50:59 hours, Defendant Robinson arrived at the residence.  (Aff. of Blalock Attach. 1 (Docket Entry No. 23-6).)  Defendant Robinson contends that he heard yelling coming from inside the residence, which Plaintiffs deny.  (Aff. of Brandon Robinson (Docket Entry No. 23-3) ¶ 4; Aff. of Ella Roberts (Docket Entry No. 26-1) ¶ 2; Aff. of Jackie Roberts (Docket Entry No. 26-1) ¶ 3[1].)

---

[1]   Plaintiffs filed their Exhibits in support of their Response to Defendants' Motion for Summary Judgment in the same docket entry as their response.  (Docket Entry No. 26-1.)   The Court

When Defendant Robinson entered the residence, he observed Plaintiff Jackie Roberts on top of the Decedent on the couch in the living room, struggling to hold down the Decedent. (DSMF ¶ 8; PRDSMF ¶ 8.)  Defendant Robinson contends that the Decedent was kicking and attempting to break free from Plaintiff Jackie Roberts.  (Robinson Aff. ¶ 5.) Plaintiffs assert that, prior to Defendant Robinson's arrival, Plaintiff Jackie Roberts was able to hold the Decedent in a love seat by holding his wrists for approximately twenty minutes, and the Decedent was not trying to get away and did not have a weapon.  (E. Roberts Aff. ¶ 2; J. Roberts Aff. ¶¶ 2-3.)   Plaintiffs point out that the Decedent weighed approximately 150 pounds and was smaller than his fourteen-year-old son.  (J. Roberts Aff. ¶ 2.)

---

directs counsel to file exhibits and briefs in separate docket entries for all future filings.

6

Defendant Robinson recalls that he walked to the couch and grabbed the Decedent's left hand in an attempt to handcuff him, but the Decedent struggled with him to avoid being handcuffed. (Robinson Aff. ¶ 6.) Plaintiffs dispute that assertion, contending that Defendant Robinson put a handcuff on the Decedent and took over from Plaintiff Jackie Roberts, bear-hugging the Decedent. (E. Roberts Aff. ¶ 3.) According to Plaintiff Jackie Roberts, Defendant Robinson came in, walked over, and put a handcuff on the Decedent's wrist, and Plaintiff Jackie Roberts then released the Decedent. (J. Roberts Aff. ¶ 3.) Plaintiff Jackie Roberts recalls that Defendant Robinson asked the Decedent to stand up to have his right hand cuffed, but the Decedent did not stand up. (Id.)

Defendant Robinson was able to apply one handcuff on the Decedent's left arm, but could not control the Decedent's

7

right arm.   (DSMF ¶ 11; PRDSMF ¶ 11.)   Defendant Robinson contends that he stood up and attempted to pull the Decedent onto the floor on his stomach to gain control of the Decedent's right arm.  (Robinson Aff. ¶ 6.)

According to Defendant Robinson, Plaintiff Jackie Roberts then released the Decedent, and the Decedent attempted to run toward the residence's front door. (Robinson Aff. ¶ 6.)  Plaintiffs contend that the Decedent was never able to break free and run.  (E. Roberts Aff. ¶ 3; J. Roberts Aff. ¶ 4.)

Defendant Robinson contends that he still had control of the Decedent's left arm, that he pulled the Decedent toward the television, and that the Decedent stumbled into the television, causing the screen to break.  (Robinson Aff. ¶ 6.) According to Defendant Robinson, he attempted to pull the Decedent toward him, and the Decedent swung at him with

8

his right fist, striking him on the right side of his forehead and knocking his hat and sunglasses off his head.   (Id.) Defendant Robinson contends that he grabbed the Decedent around his upper torso with both arms, and he and the Decedent both fell to the ground, landing in front of the residence's front door.   (Id.)   According to Defendant Robinson, while on the floor, he was able to get on top of the Decedent, who was lying on the floor on his back trying to fight Defendant Robinson. (Id.)   Defendant Robinson was able to gain control of the Decedent's left wrist again, and he put all of his body weight on the Decedent in an effort to hold him down.  (DSMF ¶ 18; PRDSMF ¶ 18.)

Defendant Robinson contends that the Decedent continued to resist arrest and to speak incoherently as Defendant Robinson continued to try to hold him down. (Robinson Aff. ¶ 6.)  According to Defendant Robinson, as

9

he attempted to gain control of the Decedent's right arm, the Decedent rolled against the front door and got into a seated position. (Id.)

Plaintiffs, for their part, contend that Defendant Robinson slung the Decedent around, the Decedent's foot hit the television, knocking out the screen, and the Decedent and Defendant Robinson both hit the floor. (E. Roberts Aff. ¶ 3; J. Roberts Aff. ¶ 3.) According to Ella Roberts, the Decedent was not kicking. (E. Roberts Aff. ¶ 3.) Plaintiffs assert that, although the Decedent was twisting and turning, trying to break free, the Decedent could not break free because Defendant Robinson had the Decedent on his stomach with his knee in the Decedent's back. (E. Roberts Aff. ¶ 3.) Plaintiffs state that the Decedent put his left hand with the cuff on it under his stomach to keep the officers from

getting to it, and the Decedent was never able to break free and run.  (E. Roberts Aff. ¶ 3.)

Defendant Robinson placed all of his body weight on the Decedent in an attempt to keep the Decedent from getting up.  (DSMF ¶ 21; PRDSMF ¶ 21.)  According to Defendant Robinson, Plaintiff Jackie Roberts was in the floor trying to help him hold the Decedent on the floor.  (Robinson Aff. ¶ 7.) Plaintiff Jackie Roberts, however, contends that he was simply kneeling by the Decedent telling the Decedent to stop resisting.  (J. Roberts Aff. ¶ 3.)

At 21:52:05, Defendant Robinson radioed Floyd County 911 and requested that his backup "step it up."  (Blalock Aff. Attach. 1.)  At 21:53:34, Defendant Robinson radioed Floyd County 911 again and advised that he still needed backup. (DSMF ¶ 24; PRDSMF ¶ 24.)

### 4.   Defendant Beck Arrives

At 21:54:30 hours, Defendant Beck arrived at the scene. (DSMF ¶ 25; PRDSMF ¶ 25.)   Defendants contend that Defendant Beck observed Defendant Robinson and Plaintiff Jackie Roberts fighting with the Decedent in a corner of the living room.  (Aff. of Greg Beck (Docket Entry No. 23-4) ¶ 5.) Plaintiffs contend that Plaintiff Jackie Roberts was simply trying to talk to the Decedent.  (E. Roberts Aff. ¶¶ 4, 9; J. Roberts Aff. ¶ 4.)   Plaintiff Jackie Roberts recalls that the Decedent had his left arm under his stomach and was struggling, attempting to get up.  (J. Roberts Aff. ¶ 4.)

According to Defendants, Defendant Beck gave the Decedent verbal commands to stop fighting and to roll on his stomach, but the Decedent refused and continued to resist. (Beck Aff. ¶ 5.)   Plaintiffs, however, recall that Defendant Robinson told Defendant Beck, "you are gonna have to tase

12

him." (E. Roberts Aff. ¶ 4; J. Roberts Aff. ¶ 4.)  The audio recordings do not reflect this statement.  Plaintiffs contend that Defendant Beck immediately began to tase the Decedent.  (E. Roberts Aff. ¶ 5; J. Roberts Aff. ¶ 4.)  The audio recordings reflect that Defendant Beck told the Decedent, "get on your stomach or I'm going to tase you." (Recording at 21:55:08.)

Defendant Beck contends that he removed the cartridge from his Taser and drive-stunned the Decedent in his left shoulder, and the Decedent went to the floor.  (Beck Decl. ¶ 5.)  According to Defendant Beck, the Decedent showed superhuman strength and was speaking incoherently.  (Id. ¶ 5.)

According to Defendants, the Decedent continued to be combative, and he tried to grab Defendant Beck's Taser. (Robinson Aff. ¶ 8; Beck Aff. ¶ 5.)  Defendant Beck drive-

stunned the Decedent with the Taser on the back near his ribs, which was unsuccessful. (DSMF ¶ 31; PRDSMF ¶ 31.) According to Defendants, they both continued giving the Decedent verbal commands to stop resisting. (Robinson Aff. ¶ 8; Beck Aff. ¶ 5.) Defendants claim that, as the Decedent continued to fight and resist arrest, Defendant Beck drive-stunned the Decedent with the Taser a third time in Defendant's back. (Robinson Aff. ¶ 8; Beck Aff. ¶ 5.) According to Defendants, when Defendant Beck activated his Taser, the Decedent reached back and grabbed the Taser. (Robinson Aff. ¶ 8; Beck Aff. ¶ 5.) Defendants contend that, when the Decedent reached back, Defendant Robinson grabbed the Decedent's right arm and placed the handcuff on his right wrist. (Robinson Aff. ¶ 8; Beck Aff. ¶ 5.)

According to Defendants, Defendant Robinson then advised Defendant Beck, "I got it," and Defendant Beck

14

stopped using his Taser.  (Robinson Aff. ¶ 8; Beck Aff. ¶5.)

Defendant Robinson never deployed his own Taser during

the incident.  (DSMF ¶ 39; PRDSMF ¶ 39.)  Defendants

claim that they used no force against the Decedent other

than Defendant Beck's Taser and soft hand techniques.

(Robinson Aff. ¶ 12; Beck Aff. ¶ 9.)

Defendants contend that, at 21:56:03, Defendant Beck

advised Floyd County 911 that the arrest had been made.

(Blalock Aff. Attach. 1.)  According to Defendants, the

Decedent continued to kick and mumble incoherently after

being handcuffed.  (Robinson Aff. ¶ 9.)  According to

Defendant Beck, the Decedent was facedown and continued

to struggle, including opening his mouth and trying to bite

Defendant Robinson.  (Beck Aff. ¶ 6.)  Defendant Beck also

recalls that he put his boot on the Decedent's head for two to

three seconds to prevent that attack, and, although the

15

Decedent complied, he began to twist and kick again. (Id.) Defendants claim that, based on the Decedent's actions, Defendant Beck restrained the Decedent's feet and Defendant Robinson placed his hands on the Decedent's back and shoulders. (Robinson Aff. ¶ 9; Beck Aff. ¶ 6.)

At 21:59:47, Defendant Beck radioed Floyd County 911 and requested that medical personnel respond to the incident location to have the Decedent examined. (Blalock Aff. Attac. 1.) According to Defendants, Defendant Beck informed Defendant Robinson that he would sit beside the Decedent. (Robinson Aff. ¶ 9.)

Defendants contend that, as they switched positions, the Decedent stopped moving and Defendant Beck turned the Decedent onto his back. (Robinson Aff. ¶ 10; Beck Aff. ¶ 6.) Defendant Beck recalls that, when he placed his hands on the Decedent, the Decedent felt limp. (Beck Aff. ¶¶ 6-7.)

16

According to Defendants, they tried to talk to the Decedent. (Robinson Aff. ¶ 10.) Defendants contend that Defendant Robinson radioed Floyd County 911 at 22:03:02 hours, advising that the Decedent was unconscious and requesting that the ambulance respond in emergency mode. (Robinson Aff. ¶ 10; Blalock Aff. Attach. 1.)

Plaintiffs contend that the Decedent never fought Defendants, never tried to bite anyone, and never tried to grab the Taser. (E. Roberts Aff. ¶¶ 3, 6, 9-11; J. Roberts Aff. ¶ 4.) According to Plaintiffs, Defendant Beck tased the Decedent several times in an attempt to get the Decedent to move his left arm from under his stomach, but the Decedent refused to move his left arm. (E. Roberts Aff. ¶¶ 5, 9-10; J. Roberts Aff. ¶ 4.) According to Plaintiffs, the Decedent was trying to prevent the officers from grabbing his left arm, and he was squirming in an attempt to break free, but he never

17

broke free.  (E. Roberts Aff. ¶¶ 10-11; J. Roberts Aff. ¶ 4.)

Plaintiffs contend that Defendant Beck tased the Decedent

until he lost consciousness.  (E. Roberts Aff. ¶¶ 6, 12; J.

Roberts Aff. ¶ 4.)    Plaintiffs claim that, after the Decedent

lost consciousness, Defendant Robinson rolled the Decedent

over and cuffed his right hand.  (E. Roberts Aff. ¶ 13; J.

Roberts Aff. ¶ 4.)  Plaintiffs further contend that the Decedent

never regained consciousness.  (E. Roberts Aff. ¶¶ 13-14; J.

Roberts Aff. ¶ 5.)[2]

---

[2]    To the extent that Defendants have presented certain
materials, including audio recordings of interviews by the
Georgia Bureau of Investigation ("GBI") to contrast statements in
the affidavits presented by Plaintiffs, the Court has not
considered those materials for that purpose.  Defendants are
essentially asking the Court to weigh evidence or make
credibility determinations, which the Court simply cannot do at
the summary judgment stage. See Feliciano v. City of Miami
Beach, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district
court 'believes that the evidence presented by one side is of
doubtful veracity, it is not proper to grant summary judgment on
the basis of credibility choices.'" (quoting Miller v. Harget, 458

While waiting for the ambulance to arrive, both Defendants continuously performed CPR on the Decedent. (DSMF ¶ 50; PRDSMF ¶ 50.)   At 22:08:06 hours, FCPD Officer Chad Matthews arrived.   (DSMF ¶ 51; PRDSMF ¶ 51.)   Officer Matthews retrieved an AED from his patrol unit and applied it to the Decedent.   (DSMF ¶ 52; PRDSMF ¶ 52.) The AED was applied to the Decedent four times, and, each time it advised no shock and the officers continued CPR. (DSMF ¶ 53; PRDSMF ¶ 53.)   Between each cycle of the AED, the officers continued to perform CPR on the Decedent.   (DSMF ¶ 54; PRDSMF ¶ 54.)

### 5.   EMS Arrives

Redmond EMS arrived, and the medics took over treatment of the Decedent, transporting him to Floyd Medical

---

F.3d 1251, 1256 (11th Cir. 2006)); Holifield v. Reno, 115 F.3d 1555, 1560 (11th Cir. 1997) ("The court may not weigh evidence to resolve a factual dispute.").

Center.  (DSMF ¶ 55; PRDSMF ¶ 55.)  The Decedent died at the hospital and was pronounced dead at 12:36 a.m.  (DSMF ¶ 56; PRDSMF ¶ 56.)

### 6.   The Autopsy

Georgia Bureau of Investigation Deputy Chief Medical Examiner Lora Darrisaw performed an autopsy.  (DSMF ¶ 57; PRDSMF ¶ 57.)  The autopsy report lists the Decedent's cause of death as "Methamphetamine toxicity."  (Autopsy Report (Docket Entry No. 23-8) at 8.)  The autopsy report lists the Decedent's manner of death as a "Homicide," and states that other significant conditions include "[p]hysical altercation, electrical control device deployment, coronary atherosclerotic disease."  (Id.)  The autopsy report also provides, in relevant part:

> This 38-year-old black man, Askari Roberts, was reportedly involved in a physical altercation with his father and subsequently with police.  He became

20

unresponsive after he was "drive stunned" with an electrical control device (Taser) and handcuffed. Additional details of the circumstances surrounding his death are documented in the death investigator report.

The autopsy discloses minor cutaneous injuries and coronary atherosclerosis of two of the major vessels that supply blood to the heart. Additionally, the vitreous electrolytes analysis reveals an indication of dehydration. Following the complete autopsy and ancillary studies, his death is ascribed to methamphetamine toxicity. The toxic effects of methamphetamine are independently sufficient to cause his sudden death. The physical altercation and electrical control device deployment are actions of others that were contemporaneous with his death. These circumstances cannot be definitely excluded as contributory to his death while under the influence of methamphetamine; however, neither the physical altercation nor the utilization of the electronic control device, in and of themselves, independently caused his death. In this instance, the manner of death is certified as homicide.

(Id.)

### 7.   Death Certificate

The Decedent's death certificate lists his immediate cause of death as "METHAMPHETAMINE TOXICITY." (Death Certificate (Docket Entry No. 23-9) at 1 (capitalization in original).)  The death certificate states that other, unrelated significant conditions contributing to death include "CORONARY ARTERY DISEASE . . . PHYSICAL ALTERCATION . . . TASER DEPLOYMENT."   (Id. (alterations and capitalization in original).)

## B.   Procedural Background

On March 14, 2017, Plaintiffs filed this lawsuit.  (Compl. (Docket Entry No. 1).)   Plaintiffs asserted a number of claims, including: (1) a 42 U.S.C. § 1983 claim for violation of the Decedent's Fourth Amendment rights against Defendants Robinson and Beck, asserted by the Decedent's Estate (id. ¶¶ 56-59); (2) a § 1983 claim for violation of the

Decedent's Eighth and Fourteenth Amendment rights against Defendants Robinson and Beck, brought by the Decedent's Estate (id. ¶¶ 64-67); (3) a Georgia wrongful death claim brought by Plaintiffs Ja'Juan Hunter and Amiya Adams (id. ¶¶ 68-75); and (4) a survival action brought under Georgia law by the Decedent's Estate (id. ¶¶ 76-79).[3]

On October 31, 2017, Defendants filed their Motion for Summary Judgment. (Mot. Summ. J. (Docket Entry No. 23).)

---

[3]      Plaintiffs also asserted claims against Floyd County, Georgia, and against Defendants in their official capacities. On June 13, 2017, the Court granted a Motion to Dismiss filed by Floyd County and dismissed the claims against Defendant Floyd County. (Order of June 13, 2017 (Docket Entry No. 20).) Because Plaintiffs' claims against Defendants in their official capacities are the functional equivalent of claims against Defendant Floyd County, those claims fail for the same reasons as set forth in the June 13, 2017, Order. See Guarda v. City of Melbourne, Fla., Case No. 6:17-CV-756-Orl-37TBS, 2017 WL 3034071, at *2 (M.D. Fla. July 18, 2017) ("[A] suit against a governmental officer in his official capacity is the functional equivalent of one against the entity of which the officer is an agent." (internal quotation marks and citation omitted)).

The briefing process for that Motion is complete, and the Court finds that the matter is ripe for resolution.

## II.   Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) allows a court to grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial burden of showing the Court that summary judgment is appropriate and may satisfy this burden by pointing to materials in the record.  Jones v. UPS Ground Freight, 683 F.3d 1283, 1292 (11th Cir. 2012).  Once the moving party has supported its motion adequately, the burden shifts to the non-movant to rebut that showing by coming forward with specific evidence that demonstrates the existence of a genuine issue for trial.  Id.

24

When evaluating a motion for summary judgment, the Court must view the evidence and draw all reasonable factual inferences in the light most favorable to the party opposing the motion.  Morton v. Kirkwood, 707 F.3d 1276, 1280 (11th Cir. 2013); Strickland, 692 F.3d at 1154.  The Court also must "'resolve all reasonable doubts about the facts in favor of the non-movant.'" Morton, 707 F.3d at 1280 (internal quotation marks and citations omitted).  Further, the Court may not make credibility determinations, weigh conflicting evidence to resolve disputed factual issues, or assess the quality of the evidence presented.  Strickland, 692 F.3d at 1154.  Finally, the Court does not make factual determinations. Rich, 716 F.3d at 530.

25

## III.  Discussion

### A.  § 1983 Claims

#### 1.  Fourteenth and Eighth Amendment Claims

Plaintiffs did not respond to Defendants' arguments concerning Plaintiffs' Fourteenth and Eighth Amendment claims.   The Court therefore concludes that Plaintiffs abandoned those claims.  See Holland v. Dep't of Health & Human Servs., 51 F. Supp. 3d 1357, 1376 (N.D. Ga. Sept. 30, 2014) (finding that a plaintiff abandoned a claim by failing to respond to the defendant's arguments concerning that claim on summary judgment).  Alternatively, those claims fail for the same reasons as set forth in the Court's Order granting Floyd County's Motion to Dismiss.  (Order of June 13, 2017, at 27-31.)  The Court therefore grants Defendants' Motion for Summary Judgment as to Plaintiffs' Fourteenth and Eighth Amendment claims.

26

### 2.   Fourth Amendment Claim

Defendants argue that Plaintiffs cannot establish causation for their § 1983 Fourth Amendment claim. Alternatively, Defendants contend that qualified immunity protects them with respect to Plaintiffs' § 1983 Fourth Amendment excessive force claim.   The Court first addresses causation, and then discusses qualified immunity.

### a.   Causation

Defendants argue that any use of force was not the proximate cause of the Decedent's death.  Plaintiffs did not squarely respond to this argument in their response to the Motion for Summary Judgment, and they therefore have abandoned any challenge to it.   The Court therefore concludes that Plaintiffs abandoned those claims.  Holland, 51 F. Supp. 3d at 1376.   Alternatively, for the reasons

discussed below, the Court agrees that Plaintiffs failed to create a genuine dispute as to causation.

"Although § 1983 addresses only constitutional torts, § 1983 defendants are, as in common law tort suits, responsible for the natural and foreseeable consequences of their actions." Jackson v. Sauls, 206 F.3d 1156, 1168 (11th Cir. 2000). "For damages to be proximately caused by a constitutional tort, a plaintiff must show that, except for that constitutional tort, such injuries and damages would not have occurred and further that such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions in issue." Id. (footnote omitted). The Eleventh Circuit has explained:

> Under traditional tort principles, causation has two
> required elements: cause-in-fact and legal or
> proximate cause. A plaintiff must first show that the
> constitutional tort was a cause-in-fact of the injuries
> and damages claimed. To establish cause-in-fact,

28

the plaintiff must show that except for the constitutional tort, such injuries and damages would not have occurred. Secondly, a plaintiff must show that the constitutional tort was the legal or proximate cause of the injuries and damages claimed. An act or omission is a legal or proximate cause of a plaintiff's injuries or damages if it appears from the evidence that the injury or damage was a reasonably foreseeable consequence of the act or omission.

Id. at 1168 n.16 (citations omitted).

Here, Plaintiffs have failed to create a genuine dispute as to whether the use of force, particularly the Taser, caused the Decedent's death.   Plaintiffs argue that a genuine dispute remains as to this issue because the autopsy report listed the Decedent's manner of death as a homicide. Admittedly, the autopsy report listed the Decedent's manner of death as a homicide.  (Autopsy Report at 8.)  The autopsy report, however, listed the Decedent's ultimate cause of death as "Methamphetamine toxicity." (Id. at 8.)  The Death

Certificate also listed the Decedent's immediate cause of death as "METHAMPHETAMINE TOXICITY." (Death Certificate at 1 (capitalization in original).) Further, the autopsy report provided, in relevant part:

> This 38-year-old black man, Askari Roberts, was reportedly involved in a physical altercation with his father and subsequently with police. He became unresponsive after he was "drive stunned" with an electrical control device (Taser) and handcuffed. Additional details of the circumstances surrounding his death are documented in the death investigator report.
>
> The autopsy discloses minor cutaneous injuries and coronary atherosclerosis of two of the major vessels that supply blood to the heart. Additionally, the vitreous electrolytes analysis reveals an indication of dehydration. Following the complete autopsy and ancillary studies, his death is ascribed to methamphetamine toxicity. The toxic effects of methamphetamine are independently sufficient to cause his sudden death. The physical altercation and electrical control device deployment are actions of others that were contemporaneous with his death. These circumstances cannot be definitely excluded as contributory to his death while under the influence of methamphetamine;

30

> however, neither the physical altercation nor the utilization of the electronic control device, in and of themselves, independently caused his death.   In this instance, the manner of death is certified as homicide.

(Autopsy Report at 8.)   The autopsy report certainly does not support Plaintiffs' contention that the use of the Taser caused the Decedent's death.   Instead, the autopsy report concluded that the Decedent's death resulted from methamphetamine toxicity, and that neither the physical altercation with Defendants nor the use of the Taser, in and of themselves, independently caused the Decedent's death. Plaintiffs fail to point to any other evidence to show that the use of the Taser proximately caused the Decedent's death. Under those circumstances, Plaintiffs have produced nothing other than speculation to support their contention that the use of the Taser caused the Decedent's death, and this claim cannot survive summary judgment.   See Cordoba v.

31

Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact." (emphasis in original) (internal quotation marks and citation omitted)); Marshall v. City of Cape Coral, Fla., 797 F.2d 1555, 1559 (11th Cir. 1986) ("All reasonable inferences arising from the evidence must be resolved in favor of the non-movant, but inferences based upon speculation are not reasonable."); see also Corzine v. Little League Baseball Inc., 589 F. App'x 482, 483 (11th Cir. 2014) (per curiam) ("The non-movant may not avoid summary judgment with speculation, conjecture, or simply by relying on her unsworn pleadings or presenting a mere scintilla of evidence in support of her claims.  Rather, she must present evidence on the basis of which a jury reasonably could find in her favor." (citations omitted)).

32

### b.   Qualified Immunity

Alternatively, Defendants assert the defense of qualified immunity.   The Court first sets forth the general standards governing qualified immunity, and then applies those standards to this case.

### i.   Qualified Immunity: In General

Qualified immunity protects government officials performing discretionary functions from suits for damages brought against them in their individual capacities. Morris v. Town of Lexington, Ala., 748 F.3d 1316, 1321 (11th Cir. 2014).   The Eleventh Circuit applies a two-part analysis to determine whether a defendant is entitled to qualified immunity. Id. at 1322.

Under the qualified immunity analysis used in this Circuit, the defendant first must prove that the allegedly unconstitutional conduct occurred while the defendant official

33

was acting within the scope of the official's discretionary authority.  Penley v. Eslinger, 605 F.3d 843, 849 (11th Cir. 2010).  To determine whether the defendant acted within her discretionary authority, the Court asks "whether the [defendant] was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within [the defendant's] power to utilize." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004).[1]

Once a defendant shows that he or she acted within his or her discretionary authority, the burden shifts to the plaintiff

---

[1]   In making this determination, the Court does not inquire "whether it was within the defendant's authority to commit the allegedly illegal act." Holloman ex rel Holloman, 370 F.3d at 1266 (internal quotation marks omitted).  Instead, the Court must "look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." Id.

to demonstrate that (1) the defendant's conduct violated the plaintiff's constitutional rights and (2) that the constitutional rights violated were "clearly established when the defendant committed the act complained of." Morris, 748 F.3d at 1322 (internal quotation marks and citation omitted); see also Penley, 605 F.3d at 849 ("Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." (internal quotation marks and citation omitted)). The qualified immunity inquiry can begin with either prong. Morris, 748 F.3d at 1322. If the plaintiff fails to make either of those showings, however, then the defendant is entitled to qualified immunity. Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010); see also Smith ex rel. Smith v. Siegelman, 322 F.3d 1290, 1298 (11th Cir. 2003)

(finding that defendants were entitled to qualified immunity based on plaintiff's failure to allege constitutional violation).

"The relevant, dispositive inquiry in determining whether a right is <u>clearly</u> established is whether it would be <u>clear</u> to a reasonable [individual in the defendant's position] that his conduct was unlawful in the situation he confronted." <u>Morris</u>, 748 F.3d at 1322 (emphasis in original) (internal quotation marks and citation omitted). Although a plaintiff "need not demonstrate that there is case-law specifically addressing his factual scenario, existing precedent must have placed the statutory or constitutional question beyond debate." <u>Id.</u> (internal quotation marks and citation omitted). A plaintiff may demonstrate that a right is clearly established by proceeding in one of three ways:

> First, [the plaintiff] may show that "a materially similar case has already been decided." Second, [the plaintiff] can point to a "broader, clearly

36

> established principle [that] should control the novel facts [of the] situation."   Finally, the conduct involved in the case may "so obviously violate[] th[e] constitution that prior case law is unnecessary."   Under controlling law, [the plaintiff] must carry [his] burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the [Georgia] Supreme Court.

Id. (some alterations in original) (quoting Terrell v. Smith, 668 F.3d 1244, 1255 (11th Cir. 2012)).

## ii.   Application to this Case

Here, the Parties agree that Defendants acted within their discretionary authority during the events that gave rise to this lawsuit.  (Pls.' Resp. Mot. Summ. J. (Docket Entry No. 26-1) at 9.)  The Court next determines whether Defendants violated clearly established law.

"The Fourth Amendment's freedom from unreasonable searches and seizures also encompasses the right to be free

37

from the use of excessive force in the course of an investigatory stop, or other 'seizure' of the person." <u>Kesinger ex rel. Estate of Kesinger v. Herrington</u>, 381 F.3d 1243, 1248 (11th Cir. 2004) (citation omitted).   When determining whether the force used to effect a seizure is reasonable for purposes of the Fourth Amendment, a court must carefully balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." <u>Graham v. Cinnir</u>, 490 U.S. 386, 396 (1989) (quoting <u>Tennessee v. Garner</u>, 471 U.S. 1, 8 (1985)).  In conducting this analysis, a court should determine "whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." <u>Kesinger</u>, 381 F.3d at 1248

38

(quoting <u>Graham</u>, 490 U.S. at 397).[1]  The court must ask whether a reasonable officer would believe that the level of force used was necessary to resolve the situation at hand. <u>Id.</u> at 1248 n.3.  In making that determination, the court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  <u>Graham</u>, 490 U.S. at 396.

The Supreme Court has observed:

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with

---

[1]  Consequently, any alleged subjective beliefs or subjective intent on Defendants' part is irrelevant to the Fourth Amendment analysis.  <u>Jean-Baptiste v. Gutierrez</u>, 627 F.3d 816, 822 (11th Cir. 2010).

the 20/20 vision of hindsight. The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, nor by the mistaken execution of a valid search warrant on the wrong premises. With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

40

Graham, 490 U.S. at 396-97 (citations omitted). The Supreme Court has cautioned that "Garner did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'" Scott v. Harris, 550 U.S. 372, 382 (2007).

Admittedly, repeatedly tasing an individual who poses no danger, who is complying with instructions, and who is not resisting arrest or who is already in handcuffs constitutes excessive force. See Wate v. Kubler, 839 F.3d 1012, 1022 (11th Cir. 2016) ("[A] reasonable officer in Kubler's position would have had fair warning that repeatedly tasing Barnes after he was handcuffed and had ceased struggling and resisting was unreasonable under the Fourth Amendment."); Fils v. City of Aventura, 647 F.3d 1272, 1292 (11th Cir. 2011) (concluding that officers violated clearly established law by tasering an individual who "showed no hostility to the

41

Defendants, did not disobey any orders, and did not make any menacing gestures"); Oliver v. Fiorino, 586 F.3d 898, 909 (11th Cir. 2009) ("Tasering the plaintiff at least eight and as many as eleven or twelve times over a two-minute span without attempting to arrest or otherwise subdue the plaintiff—including tasering Oliver while he was writhing in pain on the hot pavement and after he had gone limp and immobilized—was so plainly unnecessary and disproportionate that no reasonable officer could have thought that this amount of force was legal under the circumstances."). Here, however, the evidence, even according to Plaintiffs, indicates that the Decedent refused to comply with Defendants' commands to give them his non-cuffed arm and that he was squirming in an attempt to break free when Defendant Beck tased him in drive-stun mode. (E. Roberts Aff. ¶¶ 10-11; J. Roberts Aff. ¶ 4.) Although

42

Plaintiffs claim that Defendant Beck tased the Decedent until he was unconscious, they fail to show that the tasing continued after the Decedent was unconscious or had stopped resisting.   Under those circumstances, the Court cannot find that the use of the Taser in drive-stun mode against the Decedent constituted excessive force.   See Mobley v. Palm Beach Cty. Sheriff Dep't, 783 F.3d 1347, 1355 (11th Cir. 2015) (observing that, where the suspect refused "to surrender his hands to be cuffed despite the application of escalating force and repeated use of a taser . . ., striking, kicking, and tasing the resisting and presumably dangerous suspect in order to arrest him were not unreasonable uses of force and did not violate [the suspect's] constitutional rights"); Hoyt v. Cooks, 672 F.3d 972, 979-80 (11th Cir. 2012) (concluding that officers' use of a Taser in the drive-stun mode against an arrestee who

43

resisted during the entire time that the officers attempted to handcuff him did not violate clearly established law); see also Smith v. LePage, 834 F.3d 1285, 1295 (11th Cir. 2016) (concluding that the single use of a taser on a noncompliant suspect was not unreasonable, even if the suspect was not armed, and noting, "our precedent does not necessarily require that a noncompliant suspect be armed to justify the use of a nonlethal taser").

Alternatively, even if the use of a Taser under the facts of this case constituted excessive force, Defendants did not violate clearly established law.  All of the cases cited by Plaintiffs involved the use of Tasers against suspects who were not resisting, were already cuffed, or were compliant.  It is clearly established in this Circuit that tasing an individual who poses no danger, who is complying with instructions, and who is not resisting arrest or who is already in handcuffs

44

constitutes excessive force.  See Wate, 839 F.3d at 1022 ("[A] reasonable officer in Kubler's position would have had fair warning that repeatedly tasing Barnes after he was handcuffed and had ceased struggling and resisting was unreasonable under the Fourth Amendment."); Fils, 647 F.3d at 1292 (concluding that officers violated clearly established law by tasing an individual who "showed no hostility to the Defendants, did not disobey any orders, and did not make any menacing gestures"); Oliver, 586 F.3d at 908 ("Tasering the plaintiff at least eight and as many as eleven or twelve times over a two-minute span without attempting to arrest or otherwise subdue the plaintiff—including tasering Oliver while he was writhing in pain on the hot pavement and after he had gone limp and immobilized—was so plainly unnecessary and disproportionate that no reasonable officer could have thought that this amount of force was legal under

45

the circumstances."). In contrast, Plaintiffs' own evidence indicates that the Decedent refused to give his hand to officers to be cuffed and that the Decedent was squirming in an attempt to get away from Defendants. Under those circumstances, using a Taser against the Decedent did not violate clearly established law. See Mobley, 783 F.3d at 1355 (stating that, where the suspect refused "to surrender his hands to be cuffed despite the application of escalating force and repeated use of a taser . . ., striking, kicking, and tasing the resisting and presumably dangerous suspect in order to arrest him were not unreasonable uses of force and did not violate [the suspect's] constitutional rights"); Hoyt, 672 F.3d at 979-80 (finding that officers' use of a Taser in the drive-stun mode against an arrestee who resisted during the entire time that the officers attempted to handcuff him did not violate clearly established law); see also Smith, 834 F.3d

46

at 1295 (holding that the single use of a taser on a noncompliant suspect was not unreasonable, even if the suspect was not armed, and stasting, "our precedent does not necessarily require that a noncompliant suspect be armed to justify the use of a nonlethal taser").

This case is also distinguishable from other cases in which the Eleventh Circuit has found the use of a Taser to be excessive force because Defendant Beck used his Taser in drive-stun, or dry-stun, mode, rather than in probe mode. The drive-stun mode of Taser use is "a much less serious application which . . . does not override the central nervous system and does not disrupt muscle control.  Rather, the dry stun mode results only in pain, a burning sensation."  Hoyt, 672 F.3d at 980.[4]  Plaintiffs fail to point to any clearly

---

[4]    A judge from the United States District Court for the Middle District of Alabama explained:

A Taser has three main modes of deployment: probe, drive-stun, and three-point.  In each mode, some part of a person's body is used to complete an electric circuit.   The sensations and consequences of the weapon vary depending on how the circuit is completed.

Probe mode is what many people envision when they think of use of a Taser.  In probe mode, two electrically charged probes are shot into a person's body, so that an electric current runs through the entire body.  This causes neuromuscular incapacitation.  In other words, the person loses control over her own body because her muscles and nerves are entirely occupied with completing the circuit.  If an individual is struggling with the police or otherwise presents a danger, the neuromuscular incapacitation can create a window in which the individual will stop resisting and can be secured.  Probe mode also causes intense [pain], felt throughout the body.

Drive-stun mode is the mode which was used on Andrews.  In drive-stun mode, the probes are taken off the Taser so only fixed electrodes remain.   The electrodes are able to complete a circuit through the air, showing an arc of lightning-like electricity.  When touched to a person's body, the circuit is completed through the top layer of skin and fat, leading to an extremely painful burning sensation.  . . . In drive-stun mode, a Taser is a pain compliance tool with limited threat reduction.  In other words, because it does not

48

established law holding that the use of a Taser in a drive-stun mode, under the circumstances present in this case, constitutes excessive force, and the Court's own research has not uncovered such authority.  <u>See</u> <u>Andrews</u>, 2015 WL 5735652, at *6 ("[T]here is no reported Eleventh Circuit case which considered the use of a Taser in only drive-stun mode. All of the cases involved probe mode, a significantly more intrusive and painful experience.  Drive-stun mode causes pain to a subject, but it generally leaves little lasting damage

---

incapacitate an individual, it will not be as effective at ending a struggle, but it can cause an individual to comply with police orders by causing pain. . . .

Finally, three-point mode is the name for when an officer uses a Taser in both probe mode and drive-stun mode at the same time, incapacitating a person and causing her extra pain.

<u>Andrews v. Williams</u>, Civil Action No. 2:13CV136-MHT, 2015 WL 5735652, at *2 (M.D. Ala. Sept. 30, 2015) (internal quotation marks and citations omitted).

beyond a burn mark.  In this way, it is a less serious use of force than the Taser use discussed in the case law, whether constitutionally reasonable or excessive.").  The Court simply cannot find that Defendants' use of a Taser in drive-stun mode violated clearly established law under the circumstances of this case.  Qualified immunity therefore protects Defendants with respect to Plaintiffs' § 1983 excessive force claim.

In sum, the Court finds that Defendants did not use excessive force against the Decedent.  Alternatively, the Court concludes that Defendants' actions did not violate clearly established law, and that Defendants are entitled for qualified immunity for this claim.

## B.   State Law Claims

### 1.   Official Immunity

Defendants argue that they are entitled to official immunity with respect to Plaintiffs' state law claims.   The Georgia Constitution provides, in relevant part, that State officers and employees "may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions." Ga. Const. Art. I, § II, ¶ IX(d).   Thus, "'[a] suit against a public officer acting in his or her official capacity will be barred by official immunity unless the public officer (1) negligently performed a ministerial duty, or (2) acted with actual malice or an actual intent to cause injury while performing a discretionary duty.'"   Tant v. Purdue, 278 Ga. App. 666, 668, 629 S.E.2d 551, 553 (2006) (quoting Wanless v. Tatum, 244 Ga. App. 882, 882, 536 S.E.2d 308, 309 (2000)).   Plaintiffs

51

concede that Defendants were performing discretionary duties.  Thus, whether Defendants are entitled to official immunity turns on whether they acted with actual malice or an actual intent to cause injury.

"In the context of official immunity, 'actual malice' means a deliberate intent to do wrong." Reed v. DeKalb Cty., 264 Ga. App. 83, 86, 589 S.E.2d 584, 588 (2003) (citing Merrow v. Hawkins, 266 Ga. 390, 392, 467 S.E.2d 336, 338 (1996)). Proof of ill will, standing alone, is insufficient to establish actual malice. Adams v. Hazelwood, 271 Ga. 414, 415, 520 S.E.2d 896, 898 (1999).  Instead, "in the context of qualified immunity, actual malice means a deliberate intention to do a wrongful act." Id.  "Such act may be accomplished with or without ill will and whether or not injury was intended." Id.

Plaintiffs agree that Defendants' acts were discretionary. (Resp. Mot. Summ. J. at 18-19.)  No evidence indicates that

Defendants acted with malice or ill will toward the Decedent. Further, no reasonable jury could conclude that Defendants used force against the Decedent with the deliberate intent to do wrong. The Taser was employed during a struggle to arrest the Decedent, who admittedly refused to allow his arms to be handcuffed and squirmed, attempting to get away. Under those circumstances, Defendants are entitled to official immunity with respect to Plaintiffs' state law claims. See Hoyt, 672 F.3d at 981 ("In this case, no reasonable jury could find that Cooks and Harkleroad used their Tasers with the deliberate intent to do wrong. As discussed above, the Tasers were employed during a struggle to arrest Allen, who refused to let his arms be brought together and handcuffed.").

53

## 2.    Wrongful Death

Defendants argue that they cannot be held liable under Georgia law for any negligence-based claim resulting from the performance of discretionary acts.  Plaintiffs agree that Defendants were performing discretionary acts.  (Resp. Mot. Summ. J. at 18-19.)  Under Georgia law, Defendants "cannot be held liable . . . for any negligence-based claim resulting from the performance of discretionary acts."  Hoyt, 672 F.3d at 981.  Plaintiffs argue that this rule does not apply here because their wrongful death claim is not based on negligence, but instead on a contention that Defendants acted with malice and intended to cause harm. (Resp. Mot. Summ. J. at 23.)   This argument is unavailing, as no evidence supports Plaintiffs' claim that Defendants acted with malice and intended to cause harm.   The Court

54

therefore grants Defendants' Motion for Summary Judgment as to this claim.

## IV.  Conclusion

ACCORDINGLY, the Court **GRANTS** Defendants' Motion for Summary Judgment [23], and **DISMISSES** this action.  The Court **DIRECTS** the Clerk to **CLOSE** this case.

IT IS SO ORDERED, this the 11 day of December, 2017.

_____
SENIOR UNITED STATES DISTRICT JUDGE